1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEW MEXICO

3    _____
                             )
4    UNITED STATES OF AMERICA,  )   No. 1:18-CR-03475-WJ
                             )
5         Plaintiff,          )
                             )   Pete V. Domenici U.S. Courthouse
6      vs.                   )   Cimarron Courtroom
                             )   Albuquerque, New Mexico
7    ROBERT DUNSWORTH,         )   Tuesday, March 10, 2020
                             )   9:30 A.M.
8         Defendant.          )
     _____)
9

10                   TRANSCRIPT OF PROCEEDINGS
                 HEARING RE: DEFENDANT'S MOTION FOR
11            SUPPRESSION OF EVIDENCE (Doc. 39)
              BEFORE THE HONORABLE WILLIAM P. JOHNSON
12             CHIEF UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:   THOMAS A. OUTLER
                         JACK BURKHEAD
16                       UNITED STATES ATTORNEY'S OFFICE
                         District of New Mexico
17                       Post Office Box 607
                         Albuquerque, New Mexico   87103
18
     For the Defendant:   IRMA RIVAS
19                       FEDERAL PUBLIC DEFENDER
                         District of New Mexico
20                       111 Lomas Blvd., NW, Suite 501
                         Albuquerque, New Mexico  87102
21
     Reported by:        MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
22                       United States Court Reporter
                         Phone:  (505)348-2334
23                       Email:  Mary_Loughran@nmd.uscourts.gov

24        Proceedings reported by machine shorthand and transcript

25   produced by Computer-Aided Transcription.

1                          I N D E X

2                                                    Page

3    CLOSING ARGUMENT BY THE GOVERNMENT - MR. OUTLER ......58

4    CLOSING ARGUMENT BY THE DEFENSE - MS. RIVAS ..........62

5    REBUTTAL ARGUMENT BY THE GOVERNMENT - MR. OUTLER .....67

6

7                     W I T N E S S E S

8    JOHN MONTOYA
        CROSS-EXAMINATION BY MS. RIVAS ....................15
9       REDIRECT EXAMINATION BY MR. OUTLER ................25

10   CHARLES CHAVEZ
        DIRECT EXAMINATION BY MR. OUTLER ..................27
11      CROSS-EXAMINATION BY MS. RIVAS ....................35
        REDIRECT EXAMINATION BY MR. OUTLER ................37
12      RECROSS-EXAMINATION BY MS. RIVAS ..................39
        QUESTIONS BY THE COURT ............................41
13
     ZAKKERY FOSTER
14      DIRECT EXAMINATION BY MR. OUTLER ..................43
        CROSS-EXAMINATION BY MS. RIVAS ....................52
15      QUESTIONS BY THE COURT ............................56

16

17   EXHIBITS                    FORMALLY MARKED/IDENTIFIED

18   No.                                                Page

19   Government Ex. 3    Officer Montoya's Lapel Video    14
     (Ex. 4 in Response to Motion by USA - Doc. 47)
20
     Government Ex. 5    Officer Chavez's Lapel Video     34
21   (Ex. 5 in Response to Motion by USA - Doc. 47)

22   Government Ex. 6    Officer Foster's Lapel Video     51
     (Ex. 6 in Response to Motion by USA - Doc. 47)
23

24   Defense Ex. B, C, D  Photographs                    18

25                          * * * * *

1   (In Open Court at 9:38 A.M.)

2           THE COURT:  All right.  We're in session in the case

3   of the United States vs. Robert Dunsworth, 18-CR-3475.

4           Would counsel enter their appearances for the record,

5   please.

6           MR. OUTLER:  Good morning, Your Honor.  Tom Outler

7   for the United States.  With me at counsel table is Jack

8   Burkhead, and also a special agent with the ATF, Sam Supnik.

9           MS. RIVAS:  Good morning, Your Honor.  Irma Rivas on

10  behalf of Mr. Dunsworth, who is present in custody this

11  morning.  Also present this morning is our student, Lidiya

12  Bayliyeva, who appears with the Court's permission.  She does

13  ask to be excused at about 10:15.

14          THE COURT:  Sure, that's fine.

15          MS. RIVAS:  Thank you.

16          THE COURT:  This is set today on the Defendant's

17  Motion to Suppress.  I've reviewed the matters.  Do counsel

18  want to go ahead and proceed with testimony?

19          MR. OUTLER:  We do, Your Honor.  The United States is

20  ready to proceed.  I do want to point out one mistake that I

21  made in the briefing for the Court.

22          There are three police officers involved in this

23  case, John Montoya, Charles Chavez and Zakkery Foster.  The

24  Court will hear from all three of these officers today and

25  watch portions of their lapel videos.  I made the mistake of

4

1   attributing some of the actions of John Montoya to Charles

2   Chavez and vice versa in the brief.  After this hearing, I'll

3   be happy to submit a corrected version of the brief if that

4   will help the Court.  But the Court will hear from all three of

5   these witnesses today.

6            THE COURT:  Okay.

7            MR. OUTLER:  Thank you.  If the Court is ready, we'll

8   call our first witness.

9            THE COURT:  Sure.  And then, are the witnesses

10   outside?

11            MR. OUTLER:  The witnesses are all three outside,

12   yes.

13            THE COURT:  Do you want the Rule invoked?

14            MS. RIVAS:  Yes, Your Honor.

15            THE COURT:  All right, that's fine.  Then just as

16   they're ready to testify, they can come into the courtroom.

17            MR. OUTLER:  The United States first calls John

18   Montoya.

19            MR. GARCIA:  Good morning, sir.  Please raise your

20   right hand.

21            (JOHN MONTOYA, GOVERNMENT WITNESS, SWORN)

22            MR. GARCIA:  Please have a seat and state your full

23   name for the record.

24            THE WITNESS:  My name is John Montoya.

25            THE COURT:  Counsel may proceed.

1                    DIRECT EXAMINATION

2    BY MR. OUTLER:

3    Q.   Mr. Montoya, what do you do for a living?

4    A.   I just recently retired from the Albuquerque Police

5    Department.

6    Q.   All right.  Were you still employed at the Albuquerque

7    Police Department on June 25, 2018?

8    A.   Yes.

9    Q.   At that time, approximately how long had you been on the

10   force?

11   A.   Roughly 17 years.

12   Q.   All right.  We're here today in court to talk about a call

13   for service and an arrest on June 25, 2018.  Do you recall that

14   call for service and arrest?

15   A.   Yes.

16   Q.   You were present there?

17   A.   That's correct.

18   Q.   How many other officers were also present?

19   A.   There were two others.

20   Q.   Who were they?

21   A.   Officer Charles Chavez and Recruit Officer Zak Foster.

22   Q.   When you say recruit officer, what do you mean?

23   A.   He was in training with me.  I was his Field Training

24   officer.

25   Q.   Okay.  So you were riding in the same vehicle?

1  A.   That's correct.

2  Q.   And how did the incident on June 25, 2018, start?

3  A.   We had a call for service.  The caller indicated that

4  there was an RV parked on the street.  It had been there for

5  more than three days.  There was also a motorcycle on the

6  sidewalk blocking the sidewalk.

7  Q.   Okay.  So your purpose there was?

8  A.   To get this individual moving along.  We'd been having

9  problems in the Southeast with RVs parking on the side of

10 businesses, and the Southeast Area Command was pretty strong

11 that we need to get these individuals moving.

12 Q.   Okay.  I believe you said you arrived on the scene with

13 Officer Foster in the same vehicle?

14 A.   That's correct.  He was driving, I was riding passenger.

15 Q.   Okay.  And Officer Chavez arrived in a separate vehicle?

16 A.   That's correct.

17 Q.   What did you see when the three of you arrived?

18 A.   We parked south of the RV.  We saw the RV.  I saw the

19 motorcycle on the sidewalk.  There was also some debris, I

20 think it was a ladder, laying out on the sidewalk, also,

21 between the RV and the motorcycle.

22 Q.   Okay.  Given what you saw there at the scene, what was the

23 outcome that you needed to achieve?

24 A.   Get the individual moving along.

25 Q.   So what if you had not found an individual there?

1   A.    What if I would have not found?  I was most likely going

2   to have to tow everything that I see there.

3   Q.    And why is that?

4   A.    The motorcycle is blocking the sidewalk.  The RV there, it

5   looks like somebody has already set up camp, so it's illegal to

6   be living out of an RV on the street.  If there's no individual

7   around, I'm going to have to tow it, most likely.

8   Q.    Okay.  So one way or another, you could not -- the police

9   officers could not leave that scene until arrangements were

10  made to move that vehicle, or move both the truck and the

11  trailer and the motorcycle?

12  A.    That's correct.

13  Q.    So what are your options for moving a vehicle like that,

14  or vehicles?

15  A.    We can try to find the owner to the RV and make

16  arrangements for them to get down there and have the RV towed,

17  or we can tow it ourselves.  We can also -- typically if I get

18  a call that there's a car parked on the street and the caller

19  says, it just arrived there, maybe I might put a red tag on it

20  and let that individual, let the owner of the vehicle know that

21  the police were here, just please move the vehicle.  But this

22  vehicle was sitting there for so long that we needed to take

23  some kind of law enforcement action, and we can call for a tow

24  truck and get it towed.

25  Q.    Okay.  If you do wind up towing, what procedure do you

1  have to follow to do that?

2  A.   We need to try to find the owner.  We need to try to -- if

3  we're going to tow it, we need to do some type of inventory of

4  the vehicle, and whatever we decide to collect and tag for

5  safekeeping, we tag it and then we have the vehicle towed.  We

6  don't want anything inside of the vehicle getting into the

7  wrong hands.

8  Q.   Okay.  I believe you started to explain this, but what's

9  the purpose of doing an inventory of what's in the vehicle?

10  A.   Just to secure the property that's in -- secure the

11  owner's property.

12  Q.   And is it mandatory that you do some sort of inventory

13  search prior to towing?

14  A.   Yes.  It's in our SOP.

15  Q.   Okay.  So you've described what you first saw and then the

16  outcome that you needed to achieve, moving the vehicles on.  As

17  you approached the trailer, what did you see?

18  A.   Like I said, the motorcycle, the ladder.  I saw that the

19  door to the trailer was ajar.  It wasn't fully shut.  And the

20  RV seemed to be connected to a pickup, and that was my first

21  initial scene.

22  Q.   Okay.  What then did you or any of the other officers do?

23  A.   Well, since -- well, now, Officer Foster was a recruit.  I

24  waited to see what kind of decision-making he was going to

25  make.  He decided to knock on the trailer, knock on the door,

1  to try to get somebody's attention.

2  Q.   So what happened after he knocked on the door?

3  A.   He knocked on the door once.  Nobody came to the door.  He

4  knocked on the door twice and nobody came to the door.  And

5  then I saw a little bit of hesitation in him, so I kind of took

6  the initiative and I walked up to the door and opened the door.

7  Q.   All right.  So when he knocked on the door, did he say

8  anything?

9  A.   He said -- yeah.  He said:  "This is the Albuquerque

10 Police Department."

11 Q.   All right.  And so after the second time that he knocked

12 on the door and said, Albuquerque Police Department, how much

13 time went by before you approached and also knocked?

14 A.   Less than a minute, I would say.

15 Q.   Okay.  And I believe you said you went to the trailer and

16 opened the door.  Did you say anything or knock on the door,

17 yourself?

18 A.   No, sir.  I just opened the door.

19 Q.   And you said the door was partially open at that point?

20 A.   Yeah, it's partially open.

21 Q.   Could you see inside the trailer?

22 A.   No, I couldn't see in at that point.

23 Q.   All right.  Why did you open that door.

24 A.   I wanted to see if somebody was really inside the trailer.

25 If nobody's there, like I said, we're going to have to tow it,

1  and I can't be towing vehicles with individuals still inside

2  the trailer, in the RV.

3  Q.   So you were -- at that point, you still believed that if

4  nobody was home, you were going to have to tow this vehicle?

5  A.   That's correct.

6  Q.   Is it fair to say you were, by pushing the door open, you

7  were simply trying to confirm that nobody was, in fact, home?

8  A.   That's correct.

9  Q.   What did you see when you pushed open that door?

10 A.   There was a bed right next to the door.  So I saw an

11 individual laying down in bed, and I called out to him and I

12 asked him to step out of the RV.

13 Q.   Did you ever enter the trailer?

14 A.   No, sir.

15 Q.   Was the person you saw in the trailer alone?

16 A.   He said he was alone -- no.  He said he was there with his

17 wife.  I asked him to step out and I asked him what his wife's

18 name was.  I don't remember what it was.  I called out from

19 outside, I called out, but nobody answered.

20 Q.   At any time, did you ever enter the trailer, itself?

21 A.   No, not that I recall, no.

22 Q.   Did you even stick your head back in there or say anything

23 further?

24 A.   No.  I had an individual outside and I had a recruit, so

25 now my focus was back on the individual who I asked to step

1    out.

2    Q.   Okay.  So as the man stepped out, describe the contact

3    that police had with him at that point.

4    A.   We asked him his name.  He gave us his name.  I think he

5    did produce a driver's license, also.

6    Q.   Do you remember the name he gave you?

7    A.   I do not remember.  I think the last name was Dunsworth.

8    I don't recall the first name.

9    Q.   So he gave you his name, he produced an ID.  What happened

10   next?

11   A.   Then, as we typically do, we run all individuals through

12   NCIC, checking for warrants.  I think my recruit checked him

13   for warrants.  He did have a warrant.  After we confronted him

14   about it, Mr. Dunsworth about that warrant, he said, yeah, I

15   think I do have warrants.  And at that time the individual was

16   placed under arrest.

17   Q.   Okay.  Did the fact that you arrested this individual

18   change the outcome that you had to achieve with the vehicle,

19   itself?

20   A.   No.  Now it's -- it's solidified now.  Unless I find

21   somebody that can come down there immediately and pick up that

22   RV, then now I have to tow the vehicle.

23   Q.   Was there any attempt to find somebody else to come and

24   move that vehicle?

25   A.   Yeah.  He did give a name of I think his girlfriend or

1   wife.  I don't remember.  He did give us a name, and we tried

2   to get a phone number.  He said it was on his phone.  We asked

3   him if we could -- we asked him where the phone was, and he

4   said it was inside the trailer.  We asked him if we could go

5   inside the trailer, and he said, yes.  He was also wanting a

6   shirt and boots.  He didn't have a shirt on.  It was still kind

7   of cold during that time, and he wanted a shirt and boots, and

8   then the phone so that we could get the phone number from the

9   phone.

10  Q.   Okay.  So the man is outside, and he first asked you for

11  some articles of clothing that he says are still inside the

12  trailer; is that right?

13  A.   That's correct.

14  Q.   And you asked if you could retrieve the clothing from the

15  trailer?

16  A.   That's correct.

17  Q.   And he says yes?

18  A.   That's correct.

19  Q.   So one officer goes in and retrieves the clothing from the

20  trailer?

21  A.   That's correct.

22  Q.   All right.  And then around the same time, or a little bit

23  later, you're asking how you can get in contact with his wife

24  or girlfriend?

25  A.   Right.  And -- go ahead; I'm sorry.

1   Q.   Well, no, you tell me.

2   A.   That's when we asked for his phone.  He said, I can get

3   the phone number from my phone.  We asked where the phone was,

4   and he said it was inside underneath a jacket or on the bed

5   somewhere.  We asked if we could go in and retrieve the phone

6   so we can get ahold of somebody that can come and get the RV.

7   Officer Chavez found the phone, handed it over to

8   Mr. Dunsworth, and that's when he gave us the phone number.

9   Q.   You just said Officer Chavez found the phone.  It was not

10  you who went into the trailer to get either the clothing or

11  find the phone; is that right?

12  A.   No.  No, I didn't even know that there was anything like

13  that in there.

14  Q.   You've already told us, I believe, that you never went

15  into the trailer.  Did you have any reason -- or did you

16  actually go into the trailer at any point after this, after the

17  man was already under arrest?

18  A.   I don't think I went into the trailer after.  Not that I

19  recall, that I went into the trailer.

20  Q.   Okay.  At this point, now that the man is under arrest,

21  you still have to find some way to move this vehicle, and

22  that's either going to be by finding another person to come

23  move it or to tow it?

24  A.   That's correct.

25            MR. OUTLER:  Your Honor, at this point I'd like to

1   play portions of the video from Officer Montoya.

2        (Whereupon Officer Montoya's Lapel Video played)

3            MR. OUTLER:  Your Honor, I'll stop the video there.

4   The Court will have an opportunity to see the videos from

5   Officer Chavez, who is standing next to the trailer at this

6   point, and Officer Foster.  The audio on Officer Foster's lapel

7   camera video is much clearer.  You can hear the conversation

8   between Officer Foster and the Defendant.  And then Officer

9   Chavez's video shows you later his entry into the trailer to

10  retrieve the clothing, and then later the phone.

11  BY MR. OUTLER:

12  Q.   Officer Montoya, having seen this here, can you confirm

13  that this was the lapel video from your lapel camera?

14  A.   That's correct, it is.

15            MR. OUTLER:  Your Honor, at this point I'd move

16  admission of this video, which has already been marked I

17  believe as Exhibit 3 to the Motion and submit it to the Court.

18            THE COURT:  Any objection?

19            MS. RIVAS:  No, Your Honor.

20            THE COURT:  It's admitted.

21       (Government Exhibit No. 3 admitted.)

22  BY MR. OUTLER:

23  Q.   Having watched this video, is there anything you want to

24  add or clarify from your testimony earlier?

25  A.   No, sir, there isn't.

1    Q.    Okay, thank you.

2            MR. OUTLER:  Thank you, Your Honor.  I'll pass the

3    witness.

4            THE COURT:  Counsel may cross-examine.

5            MS. RIVAS:  Thank you, Your Honor.

6                          CROSS-EXAMINATION

7    BY MS. RIVAS:

8    Q.    Good morning.

9    A.    Good morning.

10   Q.    You just testified that towing the vehicle was most

11   likely, in your words?

12   A.    Yes, ma'am, I did.

13   Q.    In fact, in this case, the trailer was not towed?

14   A.    No.

15   Q.    You had no personal knowledge how long that trailer had

16   been there?

17   A.    Only from what was indicated by the caller.

18   Q.    So you had no personal knowledge how long it had been

19   there?

20   A.    No, no.

21   Q.    You said that you -- you just testified that an inventory

22   search was mandatory.  But there was not one done here?

23   A.    No, because --

24   Q.    Thank you.

25           We just observed the video.  You said that you believed

1  that Mr. Dunsworth produced an identification card?

2  A.   I thought -- that's my memory of it.  I thought he did

3  produce an ID card.

4  Q.   So viewing the video, is that still correct?

5  A.   I think so.  I think an ID was produced later.

6  Q.   When?

7  A.   I think after he retrieved more items.  That's just my

8  memory of it.  There was an ID that was produced later on.

9  Q.   You indicated that you would have to tow it until you

10  could find the owner.

11  A.   That's correct.  Or a responsible person that this

12  individual would allow to come and pick it up.

13  Q.   When -- and perhaps we need to play a few more minutes on

14  this video, but when Mr. Dunsworth asked for a shirt, your

15  response is:  "My partner can get it for you"?

16  A.   That's correct.

17  Q.   It wasn't -- he never said, yes?

18  A.   I asked him permission, for his permission to go in and

19  get his shirt and boots, and he gave us permission.

20  Q.   So regarding his shirt, he didn't use the word "yes"?

21  A.   I don't know exactly what the words were.

22  Q.   You just testified that he described that his phone was in

23  his jacket?

24  A.   No, not in his jacket, near it or underneath his jacket.

25  I don't recall.

1   Q.   Did you hear that on this video?

2   A.   I don't recall.  We'd have to play it.

3   Q.   Play it a little bit longer?  Did he describe what the

4   jacket looked like?

5   A.   I don't recall if he did describe it.

6   Q.   And did he describe where it was?

7   A.   I think he said it was on the bed, or near the bed.  That

8   conversation, I think, was more with Officer Chavez than it was

9   with me.

10  Q.   When you approached the trailer, you didn't see

11  Mr. Dunsworth outside the trailer?

12  A.   No, ma'am, I did not.

13  Q.   And we just saw the video and you couldn't see inside the

14  windows of the trailer?

15  A.   No, ma'am, you couldn't.

16  Q.   I'd like to show what you we would like to mark as

17  Exhibits B, C and D.  And we have copies for the court and for

18  opposing counsel.

19          MS. RIVAS:  May I approach, Your Honor?

20          THE COURT:  Sure.

21  BY MS. RIVAS:

22  Q.   I'm going to hand you three pictures.

23          Have you had a chance to look at them?

24  A.   Yes.

25  Q.   Do those -- to your memory, is that what you saw that

1  morning?

2  A.   Yes, it looks like it.

3  Q.   And it shows there that you could not see through the

4  windows?

5  A.   That's correct.

6         THE COURT:  Are you offering these?

7         MS. RIVAS:  Your Honor, yes.  We'd ask that they be

8  admitted into evident.

9         THE COURT:  Any objection?

10        MR. OUTLER:  No objection.

11        THE COURT:  They will be admitted as Exhibits B, C

12  and D for purposes of this hearing.

13        MS. RIVAS:  Thank you.

14      (Defense Exhibits No. B, C and D admitted.)

15  BY MS. RIVAS:

16  Q.   When you approached the trailer -- let's take a look at

17  Exhibits C and D.  That door was closed?

18  A.   No, you can see that it -- like in C, both C and D, you

19  can see that it's ajar.

20  Q.   Can you see through that?  Is there a gap?

21  A.   No, there's no gap.  But you said that the door was

22  closed.

23  Q.   Closed.

24  A.   Okay, it's not locked, but it's -- it's ajar.

25  Q.   So that door to you is ajar?

1    A.    Yes.  I cannot see into the trailer, but it's open.  It's

2    ajar.

3    Q.    When you opened the door to the trailer, you didn't have a

4    search warrant?

5    A.    No, ma'am, I did not.

6    Q.    And the bench warrant wasn't discovered until Officer

7    Foster asked Mr. Dunsworth for his identifiers?

8    A.    I think that's correct.

9    Q.    You did ask Mr. Dunsworth to step out?  You asked him to

10   step out, sir?

11   A.    That's correct.

12   Q.    But before he stepped out, he asked you permission to put

13   on his pants?

14   A.    I think that's -- yeah, I think I heard it in the video

15   now.  I think he did ask to put on some clothes, yeah.

16   Q.    And he only began to put on his pants after you gave him

17   permission?

18   A.    After I gave him permission, okay, yes.

19   Q.    He stepped outside, and he didn't have shoes with him?

20   A.    No, ma'am.

21   Q.    And he didn't have shoes on?

22   A.    No, he didn't have shoes on.

23   Q.    He didn't have a shirt on?

24   A.    That's correct.

25   Q.    And you never gave Mr. Dunsworth a Miranda warning?

1  A.   Not that I recall, ma'am.

2  Q.   But you started asking him about his bruises on his

3  stomach?

4  A.   I just -- yes.  Yes, I did.

5  Q.   There were three officers there that day?

6  A.   Yes, ma'am.

7  Q.   In fact, Mr. Dunsworth asked you, in his words, "why did

8  you come all strong"?

9  A.   I don't recall that, ma'am.

10  Q.   He asked why there was three of you there that day?

11  A.   I don't recall that.  But like I explained, Officer Foster

12  and I were in -- he was in training and I was his Field

13  Training Officer.  That was the only reason.  Or we would have

14  gone with just two officers.

15  Q.   But there were three of you there that day?

16  A.   That's correct, ma'am.

17  Q.   And you were standing around him?

18  A.   Yes, ma'am.

19  Q.   Officer Chavez was by the door of the trailer?

20  A.   Yes, ma'am.

21  Q.   And you were behind him?

22  A.   Behind who?

23  Q.   Behind Mr. Dunsworth.  You were standing behind him?

24  A.   At what point?

25  Q.   You were standing south on the sidewalk?

1   A.   Yes.

2   Q.   Behind Mr. Dunsworth?

3   A.   Yes, ma'am.

4   Q.   And Officer Foster was standing in front of him?

5   A.   Standing on the street parallel with me.

6   Q.   When Officer Chavez is asking Mr. Dunsworth about the

7   location of the phone, Officer Foster is handcuffing him?

8   A.   I don't know at what point those two events happened.

9   Q.   Do you remember the series of questions that Officer

10  Chavez asked him?

11  A.   I do not, ma'am.

12  Q.   You don't remember that he asked him, in quick sequence,

13  "Is it in the nightstand"?

14  A.   I don't recall that.

15  Q.   "Is it on the floor"?

16  A.   I don't recall that.

17  Q.   "Is it in a backpack"?

18  A.   I don't recall that.

19  Q.   "She wouldn't have the phone"?

20  A.   I don't recall that.

21  Q.   "She has her own phone"?

22  A.   I'd be pushing it if I said -- I don't recall that,

23  either.

24  Q.   And you'd never met Mr. Dunsworth, so you didn't know what

25  he looked like?

1   A.   No, ma'am.

2   Q.   You didn't know if anyone was in the trailer?

3   A.   No, I didn't.  He said that his wife was in the trailer,

4   but then said maybe she went to the store.  But I still didn't

5   know if anybody else was in there.

6           MS. RIVAS:  Your Honor, if I could have a minute.

7           THE COURT:  Certainly.

8   BY MS. RIVAS:

9   Q.   Officer, I'm going to present to you what we have

10  submitted as Exhibit A, and opposing counsel and the Court

11  should have a copy.

12          MS. RIVAS:  If I may approach.

13          THE COURT:  You may.

14  BY MS. RIVAS:

15  Q.   Is that the warrant that caused Mr. Dunsworth to be

16  arrested that day?

17  A.   I would assume it is.  Daniel Dunsworth.  I would have to

18  assume it was.  I think it was a misdemeanor warrant -- yeah,

19  traffic.  I would think it is.

20  Q.   So that warrant was from a traffic ticket?

21  A.   That's correct.

22  Q.   So a traffic ticket, and he failed to show up to court?

23  A.   I wouldn't know.  Oh, you mean on this one?  That's what

24  created this warrant?

25  Q.   Yes.

1   A.   Does it have FTA?  Yeah, it would be, most likely, yeah.

2   Q.   And you don't know -- most likely if it's traffic, he

3   wouldn't have been arrested when those tickets were issued?

4   A.   When the tickets were issued themselves?

5   Q.   Yes.

6   A.   No, you just issue a ticket.

7   Q.   Okay.  And that warrant describes Daniel Dunsworth as

8   being 5'9", brown eyes, 180 pounds, born in 1959?

9   A.   Yes, ma'am.

10  Q.   That could be a lot of people?

11  A.   It could be a lot of people, yeah.  Just by those minimal

12  descriptors, yeah, it could be.

13  Q.   And when you approached, you didn't find Mr. Dunsworth

14  driving the vehicle?

15  A.   No, ma'am.

16  Q.   You had the option of just citing the vehicle, you

17  testified earlier, and just placing a red tag on the vehicle --

18  A.   Yes.

19  Q.   -- if you didn't find a driver?

20  A.   Yes.  But like I said, in the Southeast, this happens

21  quite a bit, and the Southeast Area Command wanted us to get

22  these individuals moving.  A lot of the times we find drug

23  activity going on inside these RVs that are parked with

24  individuals.  So businesses complain, and they want us to get

25  them moving, get them going.

1  Q.   But that was an option available to you, to just red tag

2  it?

3  A.   Yes, that could have been an option.  But the reason I

4  didn't do it in this case is because the caller stated that it

5  had been there for a while, and by the looks of the motorcycle

6  and the ladder there, this individual, it looked like he had

7  set up camp.

8  Q.   But you had no personal knowledge how long he had been

9  there?

10 A.   No, ma'am, I did not.

11 Q.   You don't know Sharon Dunsworth, Mr. Dunsworth's wife?

12 A.   No, ma'am.  No, I don't have any personal -- I don't know

13 her personally.

14 Q.   You don't know how long she had been gone?

15 A.   No, ma'am.

16 Q.   Or if she was on her way back?

17 A.   No.  What we ended up doing is taking Mr. Dunsworth to

18 jail --

19 Q.   Thank you, Officer.

20      So you didn't know if she was on her way back?

21 A.   No, ma'am.

22 Q.   Thank you.  In fact, between the officers, you also

23 discussed maybe seeking Mr. Dunsworth's sister to maybe pick up

24 the trailer?

25 A.   I don't recall that.

1  Q.   And in this case, the trailer was not towed?

2  A.   No, ma'am.  But there was a reason.

3  Q.   And no inventory search?

4  A.   No, ma'am, not that I know of.

5              MS. RIVAS:  Thank you.

6              THE COURT:  Is there redirect?

7              MR. OUTLER:  Briefly, Your Honor.  Thank you.

8                      REDIRECT EXAMINATION

9  BY MR. OUTLER:

10 Q.   Officer Montoya, why was the vehicle not towed?

11 A.   Because -- so, we took Mr. Dunsworth to the Southeast

12 Substation for processing before we go to jail.  We left

13 Officer Chavez in charge of the scene.  Mr. Dunsworth gave us a

14 phone number, and Officer Chavez was trying to make the phone

15 calls.  I think he got a voice mail.  But later it was found

16 out, we did get ahold of somebody and they did come down to the

17 scene.

18 Q.   All right.  If Officer Chavez had not been able to get in

19 touch with the girlfriend or wife, or anybody else to come move

20 the vehicle, what would have happened?

21 A.   Yeah, before we left, I said, if you can't get ahold of

22 anybody, Charles, we're going to have to tow it.

23 Q.   And if you had towed it, you would have done an inventory

24 search?

25 A.   That's correct, sir.

1    Q.    When you opened the door to that trailer, did you see a

2    firearm?

3    A.    No.  No, sir.

4    Q.    Did you retrieve anything from the trailer?

5    A.    No, sir.

6    Q.    So the only thing of significance you saw was

7    Mr. Dunsworth, himself?

8    A.    Yeah.  And that's when I asked him to step out.

9             MR. OUTLER:  Thank you.  That's all I have, Your

10   Honor.

11            THE COURT:  May the witness be excused?

12            MS. RIVAS:  Yes, Your Honor.

13            THE COURT:  Thank you.  You're free to leave, sir.

14            THE WITNESS:  Thank you, Your Honor.

15            MR. OUTLER:  Your Honor, may Officer Montoya remain

16   in the courtroom while the other officers testify?

17            THE COURT:  Yes.  If he's concluded his testimony, he

18   may.

19            MR. OUTLER:  Thank you.

20            THE COURT:  Who is the next witness?

21            MR. OUTLER:  Next, the United States calls Officer

22   Charles Chavez.

23            MR. GARCIA:  Good morning, sir.  Please raise your

24   right hand.

25            (CHARLES CHAVEZ, GOVERNMENT WITNESS, SWORN)

1    MR. GARCIA:  Please have a seat and state your full

2  name for the record.

3    THE WITNESS:  My name is Charles Chavez, retired

4  Albuquerque Police Officer.

5    THE COURT:  You may proceed.

6    DIRECT EXAMINATION

7  BY MR. OUTLER:

8  Q.   Officer, or former Officer Chavez, on June 25, 2018, were

9  you still employed as an Albuquerque police officer?

10 A.   Yes.  Yes, I was a full-time Albuquerque police officer in

11 uniform driving a marked police car.

12 Q.   All right.  At that time, how long had you been an officer

13 with APD?

14 A.   You said -- I think about 18 years, because it was 2018,

15 and I started in 2000.

16 Q.   And when did you retire?

17 A.   About a year ago last March.  So 2019, March of 2019.

18 Q.   All right.  We are talking about the incident that

19 happened with the Defendant on June 25, 2018.  Were you present

20 at that scene?

21 A.   Yes.

22 Q.   Why were you there?

23 A.   I was responding to a dispatched call for service.  It was

24 dispatched through our computer.  I can't remember if it was

25 dispatched over radio, but I know it was dispatched at least by

1    computer to us.

2    Q.    So you received a call directly, or were you there just as

3    backup?

4    A.    Two officers or police cars were dispatched, and my role

5    was assigned as a backup officer.  When the dispatch occurs,

6    they assign one as a backup and one as the primary

7    report-writing officer.

8    Q.    Okay.  Who was the primary report-writing officer?

9    A.    I believe it was Officer Zak, or Zakkery Foster.

10   Q.    Who was the other officer there?

11   A.    Officer John Montoya was with Officer Foster in the same

12   vehicle.

13   Q.    All right.  When you arrived at the scene, what did you

14   see?

15   A.    I did see on Virginia, S.E., Virginia Street, I did see a

16   camper attached to a vehicle, just as described in the

17   dispatch, and I also saw a motorcycle on the sidewalk.  The

18   vehicles were both facing northbound at about the approximate

19   address that was on the dispatch, and I viewed it from behind,

20   so I was also facing northbound.

21   Q.    We've heard from Officer Montoya generally describing what

22   officers saw and the contact with the Defendant.  Did you

23   ultimately -- did you go into this trailer?

24   A.    During the course of the investigation of the call, I did

25   enter the trailer at some point, yes.

1    Q.    Okay, let's talk about that.  What reason did you have to

2    go into the trailer initially?

3    A.    Initially, the subject that we were dealing with had asked

4    for his shirt, and the other officers and I said, "Okay, so you

5    want us to get your shirt from inside the trailer?"  So I

6    stepped in to get his shirt.  While I was in there, just a step

7    or two in, I can't remember if it was the Defendant or if it

8    was one of the other officers who said, can you also get the

9    boots for him.

10   Q.    So when you asked, "Do you want us to get your shirt for

11   you," do you remember what the man said?

12   A.    I remember he did say, "Yes."

13   Q.    Okay.  So you went initially inside to get a shirt and

14   then shortly thereafter boots?

15   A.    Yes.  While in there, I picked up a shirt and I also

16   brought boots out.  I was in there just momentarily.

17   Q.    Approximately how long were you in there to get the shirt

18   and boots?

19   A.    Possibly less than 20 seconds.  Approximately.

20   Q.    After you had the boots and shirt in hand, what did you

21   do?

22   A.    Walked right back out of the trailer and either handed to

23   him or set them on the ground next to the Defendant.

24   Q.    Okay.  Did you ever enter the trailer again?

25   A.    Yes.

1   Q.   Why was that?

2   A.   I can't remember the amount of minutes, if it was a span

3   of a few minutes later, but it was determined that this

4   Defendant was going to be placed under arrest, and as the

5   assisting officer -- we were trying to see if we could turn

6   possession of the vehicle and camper that was connected to the

7   vehicle, the trailer, over to someone with the Defendant's

8   permission, and he said we could turn that over to his wife.

9   We asked, "Can we call your wife?"  And he did not know her

10  number.  So he told us, "Her number is in my phone," which is

11  back inside the camper and the trailer, and I said, "Can I get

12  your phone out of the camper and then we'll be able to get her

13  number to call?"  And he said, "Yes."  And he tried to describe

14  to me where his phone would be inside the trailer.

15  Q.   Okay.  What did you then do?

16  A.   I then stepped in to try to look for the telephone in the

17  areas he told me.  He said it would be on the bed, he said it

18  might be on the nightstand.  Initially, it wasn't seen right

19  there in plain sight.

20  Q.   You didn't see anything where he had described it might

21  be?

22  A.   Correct.

23  Q.   Okay.  What did you do?

24  A.   I stepped back out of the trailer.  It was also at about

25  that moment that, understanding from Officer Foster, that he

1  was going to place the handcuffs on the Defendant, so I stepped

2  out to get myself on the ground in case any assistance would be

3  necessary.  At about the same time, I was also trying to

4  clarify if the phone could be anywhere else, and he said, "No,

5  it should be there on the bed," or like I said, maybe the

6  nightstand.  So it should be in that general bed area.  And the

7  bed area is immediately next to the door that I entered

8  through.

9  Q.   When you say you were trying to clarify, you were asking

10  him, again, where the phone was?

11  A.   Yes.

12  Q.   And he, again, told you the same thing, which was?

13  A.   That it should be in that area by the bed, or not far from

14  the bed.

15  Q.   All right.  So what did you do?

16  A.   As I stepped back in, right there at the bed, which is

17  right by the door, I moved the sheets or blanket and I did see

18  a jacket.  I lifted the jacket up and I immediately see the

19  phone in the interior jacket pocket.

20  Q.   When you saw the phone in the interior jacket pocket, did

21  you see anything else?

22  A.   Yes.  As I picked up the jacket, under the jacket, not in

23  a pocket, but under the jacket I see what I recognize to be a

24  firearm.  It looked to be a dark color.  From my training and

25  experience, I recognized that as a handgun, also known as a

1  possible pistol.

2  Q.   Did you retrieve that firearm?

3  A.   No.   I retrieved the telephone and put the jacket back

4  down, and went out to ask how to get the phone number out.

5  Q.   Was the firearm of any significance to you at that point?

6  A.   No.   I was trying to get the phone number out.

7  Q.   Okay.   So you took the phone back outside.   What did you

8  do?

9  A.   We were trying to -- after we retrieved the number, I

10  tried calling his wife many times.   He showed me where the

11  number was.   I tried dialing many times.   I know initially I

12  was not getting an answer.   I can't remember the span of time

13  going by, but it was going to get to a point where the other

14  officers needed to leave to go process paperwork for that

15  arrest.   When someone is arrested, we need to secure their

16  vehicle, most likely with a tow company, and I was directed,

17  then, by the other officers to stay there and see if I could

18  get ahold of the wife maybe in a few more minutes, or if not,

19  then I would have to start the tow truck.   And the odds were

20  very high, since I wasn't getting ahold of someone in a few

21  minutes, to start a tow.

22  Q.   So Officer Montoya and Officer Foster left with the

23  Defendant after he had been placed under arrest, but you stayed

24  on the scene, correct?

25  A.   Yes.

1   Q.   And your purpose there was to?

2   A.   Turn over the vehicle either to a tow company or to the

3   wife, which we were given permission by the Defendant.

4   Q.   Okay.  If you had never been in contact with the wife or

5   anybody else to come move the vehicle, what would have

6   happened?

7   A.   We would have towed the vehicle and the connected trailer.

8   Q.   If you had had to tow the vehicle, what process would you

9   have had to follow before that?

10  A.   Our procedures with our agency are to do an inventory

11  search, and we are to secure certain things, to include

12  firearms, in a tow search, tow inventory search, for

13  safekeeping.  That way they are secured in the police

14  department for safekeeping rather than just being in a tow

15  yard.

16  Q.   Would an inventory search include things like looking in

17  clothing and securing clothing that was on a bed inside the

18  trailer?

19  A.   Yes.  Inventory searches are very -- we try to make a very

20  detailed list.

21  Q.   Okay.  In your training and experience, would you have

22  located that firearm during an inventory search?

23  A.   Yes.

24       MR. OUTLER:  Your Honor, at this point I'd like to

25  play the portions of the lapel video from Officer Chavez.

1      THE COURT:  Okay, you may proceed.

2      (Whereupon Officer Chavez's Lapel Video played)

3  BY MR. OUTLER:

4  Q.   Officer Chavez, having viewed that, can you confirm for

5  the Court that that is, in fact, your lapel video?

6  A.   Yes, that was my lapel video.

7      MR. OUTLER:  I move admission of Officer Chavez's

8  lapel video.

9      THE COURT:  Any objection?

10      MS. RIVAS:  No, Your Honor.

11      THE COURT:  It's admitted.

12      (Government Exhibit No. 5 admitted.)

13  BY MR. OUTLER:

14  Q.   Officer Chavez, did we watch the portions of your video

15  that captured all of your entries into the trailer and your

16  conversations with the man who was there?

17  A.   Yes.  If there was any other entry -- like, I think I was

18  handed an item to put back in.  We were going to leave some of

19  his property there that might have been in his pockets.  So I

20  can't remember -- there could have been another, like, just

21  placing those items back in or something.

22  Q.   Okay.  Having watched this, is there anything you want to

23  clarify or add to your testimony from before?

24  A.   No.  I think the video showed the stuff that we've been

25  talking about now.

1    Q.    Okay, thank you.

2          THE COURT:  Thank you, Your Honor.  Pass the witness.

3                      CROSS-EXAMINATION

4    BY MS. RIVAS:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    Officer, when you asked about the phone -- we just heard

8    your voice on the video.  You asked whether his phone might be

9    in the nightstand?

10   A.    Yes, I think I questioned, is it the nightstand, or asking

11   where it was, yes.

12   Q.    And you asked whether it was a black phone?

13   A.    Yes, I asked a description of it.

14   Q.    "Next to," and you didn't finish that sentence.

15   A.    There was a sentence I didn't finish?

16   Q.    Yes.  Do you remember that?

17   A.    That may be --

18   Q.    Do you remember not finishing that sentence?

19   A.    I think I remember seeing that on the video now.

20   Otherwise, I can't remember.  Without -- if I wouldn't have

21   watched the video, I probably wouldn't have remembered.

22   Q.    You asked whether it was in a backpack?

23   A.    I did ask that question.  I just saw that now, yes.

24   Q.    And whether she would have a phone?

25   A.    Yes, I asked that also on this video, if his wife may have

1  had his phone, or if she had her own.

2  Q.   So that's -- I'm counting approximately six questions.

3  A.   That could be the count, yes.  I haven't counted it

4  myself.  It may be.

5  Q.   And when you asked those questions, Officer Foster was

6  handcuffing Mr. Dunsworth?

7  A.   It looked to be about going on at the same time on the

8  video.

9  Q.   And the phone wasn't located in any of those places that

10  you asked about?

11  A.   Such as the nightstand, on the floor, or visibly on the

12  bed?

13  Q.   Yes.

14  A.   No.

15  Q.   Thank you.  We also heard, regarding his wife, Sharon

16  Dunsworth, he told you, or he told the officers that she would

17  be right back?

18  A.   Yes.  He expected her back, as far as we understood.

19  That's what he was telling us.

20  Q.   You also were curious about possibly releasing the trailer

21  to his sister who lived a few blocks away?

22  A.   I can't remember right now without hearing on the video.

23  It does sound a little familiar, that I think we were

24  researching other ideas of how we could get the trailer to

25  someone that could take responsibility for it.

1  Q.   If I played that for you, would that maybe refresh your

2  memory?

3  A.   If I'm asking him who I could release the trailer to?

4  Q.   Right.

5  A.   It may refresh my memory, yes.

6       (Whereupon Officer Chavez's Lapel Video played)

7  BY MS. RIVAS:

8  Q.   Does that refresh your memory?

9  A.   Yes.  I was trying to do research to see if he did have

10 other family that could possibly get the camper for him.

11 Q.   Thank you.  And in this case, the trailer was not towed?

12 A.   It was not towed, no.

13 Q.   And it was not inventoried?

14 A.   No.

15      MS. RIVAS:  I have no other questions, Your Honor.

16      THE COURT:  Is there redirect?

17      MR. OUTLER:  Briefly, Your Honor.

18                    REDIRECT EXAMINATION

19 BY MR. OUTLER:

20 Q.   Officer Chavez, you already answered that when you first

21 saw that firearm, you did not retrieve it; is that correct?

22 A.   Correct.

23 Q.   You left it where it was?

24 A.   Yes.

25 Q.   Eventually the firearm was retrieved, correct?

1  A.    Yes.

2  Q.    And why was that?

3  A.    When the other officers were going to leave to the police

4  station with the Defendant, and we had already been on scene

5  quite a while and the wife still was not back, even though

6  there was a chance she was going to come back and I was going

7  to give it a few more attempts while I waited, I was probably

8  moments away from calling for a tow truck.  So as I said

9  earlier, our procedure then is to start to secure things.

10       As I said now, an inventory wasn't done, but I was

11  expecting to probably do one very soon since family had not

12  showed up yet and that firearm had to be secure.  And the

13  primary officers were going to start that process.

14  Q.    Is it standard procedure to secure firearms, particularly

15  during an inventory procedure?

16  A.    Yes.  When a vehicle is towed, even on traffic stops or

17  other stops, if a vehicle is going to be towed away, we do

18  secure firearms rather than letting them just sit in the

19  vehicle and go into the tow yard.

20  Q.    At that point, was the firearm evidence of any crime in

21  your mind?

22  A.    No.  It was going to be for safekeeping since the vehicle

23  was -- I thought I was moments away from starting a tow, and

24  then the family member showed up, or the wife.

25            MR. OUTLER:  Thank you, Your Honor.  That's all I

1  have.

2          THE COURT:  Are there any other questions of this

3  witness?

4          MS. RIVAS:  Your Honor, if I may, quickly.

5          THE COURT:  Sure.

6                    RECROSS-EXAMINATION

7  BY MS. RIVAS:

8  Q.   Officer Chavez, you didn't have a discussion with Officer

9  Montoya that there was a gun in the vehicle?

10 A.   I would have to refresh my memory on that, on what we

11 discussed.  I know on the video we just saw now, it did not

12 appear that that was discussed at that point, but I know later

13 on as they were about to leave for the substation, we

14 communicated that, because as I said, we were going to have to

15 make that safe with the high possibility of a tow truck coming.

16 Q.   And didn't he say, it depends on his criminal history?

17 Didn't you confirm his criminal history before Mr. Dunsworth

18 was taken to the substation?

19 A.   I can't remember at what point his criminal history was

20 confirmed, or to what detail.  We know that he had a warrant

21 for his arrest, as a wanted person on scene there.  I can't

22 remember to what extent other resources were done at the scene.

23 Q.   During your recording of this incident, did you ever stop

24 the audio?

25 A.   I can't remember right now.  That would have to be

1 researched through our video.  Maybe the video would show that.

2 I can't remember.

3 Q.   If you did, why would you stop the audio?

4 A.   Sometimes audio is stopped to discuss tactics among each

5 other, with officers.  That way that's not viewed later on in

6 court cases, to see police tactics.  Or just even to hear

7 tactics in front of the Defendant or the subject that we're

8 dealing with.  So sometimes the audio can be stopped on that,

9 even though your attempt is to not let somebody nearby hear

10 your tactics.

11 Q.   Did you discuss tactics with any of the officers that day?

12 A.   I can't remember now.  I do remember discussing some

13 tactics as we walked up.  That refreshed myself, in the video,

14 about where we were going to stand and position ourselves on

15 our approach.  Other parts I can't remember right now.

16 Q.   I think that shortly after this, you turned off the audio.

17 May I play it for you?

18       MR. OUTLER:  Your Honor, objection; relevance.  What

19 difference does it make?

20       MS. RIVAS:  Your Honor, the officer just testified

21 that basically he was going to retrieve the handgun as a

22 procedure and not as an investigation into a crime, and I think

23 that the audio would show that, in fact, the gun most likely

24 was retrieved as part of his investigation into a crime.

25       THE COURT:  I'll allow it.  Go ahead.

1      MS. RIVAS:  Thank you.

2      (Whereupon Officer Chavez's Lapel Video played)

3   BY MS. RIVAS:

4   Q.   Do you hear any audio?

5   A.   No, I don't hear audio.

6   Q.   Do you remember what you were discussing?

7   A.   No, I don't remember.

8        MS. RIVAS:  I don't have any other questions, Your

9   Honor.

10       MR. OUTLER:  Nothing further, Your Honor.  Thank you.

11       THE COURT:  Let me ask, Officer Chavez, were you the

12  one who retrieved the handgun?

13       THE WITNESS:  I would have to be reminded on the

14  video.  I can't remember at this point, without refreshing from

15  the video, which one of us, then, finally does retrieve it to

16  take it to the police station.  I don't remember.

17       THE COURT:  And that's fine.  The Defendant was being

18  placed in cuffs on misdemeanor warrants?

19       THE WITNESS:  Yes, from my remembering.  My memory is

20  he was under arrest for misdemeanor warrants.

21       THE COURT:  At some point, if you know, and if you

22  don't, then just indicate you don't, but at some point, did you

23  learn that the Defendant had a prior felony conviction?

24       THE WITNESS:  At some point in that day, I did learn

25  that.  I can't remember what time of the day I did.

1      THE COURT:  Okay.  Do you know when you learned that

2  information, was that before or after the handgun was

3  retrieved?

4      THE WITNESS:  It was later in the day.  Like we said,

5  I know at the scene one of us retrieved it, because they were

6  going to take it -- they, as in the other officers or myself,

7  were going to place it in evidence as a safekeeping measure and

8  that was the reason it was retrieved out of that camper.

9      THE COURT:  Again, what I'm getting at, and again, if

10  you don't know, but was the handgun retrieved as a safekeeping

11  measure, or was it retrieved because the police officers

12  learned that the Defendant had a prior felony conviction?

13      THE WITNESS:  It was taken as a safekeeping measure.

14  At that point on the scene, I know we didn't know about any

15  felony convictions at that point.  I don't know -- as I just

16  testified now, or moments ago, I didn't know the extent of his

17  criminal history on scene, but I know that confirmation of that

18  did come later on at the police station that day, of his felony

19  record.

20      THE COURT:  Okay.  Did defense counsel have any

21  questions in light of my questions?

22      MS. RIVAS:  No, Your Honor.

23      MR. OUTLER:  Nothing further, Your Honor.  Thank you.

24      THE COURT:  May the witness be excused?

25      MR. OUTLER:  Yes.

1      THE COURT:  You're welcome to leave, or if you want,

2  you can remain in the courtroom.

3      THE WITNESS:  Thank you.

4      THE COURT:  The Government may call the next witness.

5      MR. OUTLER:  Thank you, Your Honor.  The final

6  witness is Officer Zakkery Foster.

7      MR. GARCIA:  Good morning, sir.  Please raise your

8  right hand.

9      (ZAKKERY FOSTER, GOVERNMENT WITNESS, SWORN)

10      MR. GARCIA:  Please have a seat and state your full

11  name for the record.

12      THE WITNESS:  Officer Zakkery Foster.

13                  DIRECT EXAMINATION

14  BY MR. OUTLER:

15  Q.   Officer Foster, would you spell your first name, please?

16  A.   Z-a-k-k-e-r-y.

17  Q.   And Foster is F-o-s-t-e-r?

18  A.   Correct.

19  Q.   How long have you been with the Albuquerque Police

20  Department?

21  A.   Approximately two years.

22  Q.   So on June 25, 2018, was that shortly after you started as

23  an officer?

24  A.   Correct.

25  Q.   And you were on training that day, correct?

1   A.   On-the-job training, yes.

2   Q.   Sitting here today, do you remember your original contact

3   and eventual arrest of a man named, or who identified himself

4   as Daniel Dunsworth?

5   A.   Correct, yes.

6   Q.   You were, in fact, the arresting officer that day?

7   A.   Yes, I was.

8   Q.   All right.  Describe to us why you went to that particular

9   scene.

10   A.   It was a call for service about an RV parked in front of

11   one of the businesses out on the street, and they just

12   requested that we have it removed.

13   Q.   Okay.  And why would it be important to remove that kind

14   of vehicle?

15   A.   At the time, it just seemed like it was a nuisance to the

16   business.  That's the information we had gotten on the call.

17   Until I got there, that's the information I had.

18   Q.   Okay.  When you arrived, what did you see?

19   A.   I saw an RV parked on I believe the east side of, I'm not

20   sure of the street name, with a motorcycle parked and blocking

21   the sidewalk along with, I think, a ladder.  We had checked the

22   information on the RV, and the registered owner of the RV

23   possibly had a warrant.

24   Q.   Do you remember the name of the registered owner?

25   A.   Daniel Dunsworth.

1   Q.   So at this point, you've seen the RV parked on the street,

2   you've run the plate, and the registration comes back to Daniel

3   Dunsworth?

4   A.   Correct.

5   Q.   And you note from your research that a man named Daniel

6   Dunsworth has warrants outstanding?

7   A.   Yes.

8   Q.   What did you do?

9   A.   We then decided to walk up to the RV and attempt to

10  contact possibly, if there's someone in it, for the fact that

11  there was a high possibility that we were going to end up

12  towing the vehicle.

13  Q.   And why is that?

14  A.   Due to the legality of it.  It had the motorcycle impeding

15  the sidewalk, as well as we were able to -- I believe it had a

16  bunch of call history previously through our department alone

17  in the area, and it's a common problem in the area that there's

18  abandoned RVs, there's people sleeping in them.  I mean, we've

19  had plenty of welfare checks in the area.

20       So typically we tow those vehicles, or we try to work with

21  someone, try to contact them to get them to move it to the

22  proper location, like an RV park or at a residence where it

23  could stay, which it wasn't parked in front of a residence.  It

24  was more of like a business area.

25  Q.   So is it fair to say that the outcome that you needed to

1  achieve as police officers was to have this vehicle moved,

2  whether you moved it or somebody else moved it?

3  A.   Correct.

4  Q.   All right.  As you approached the vehicle, what did you

5  see?

6  A.   I saw that the back I think passenger side door, rear

7  door, was cracked open, the motorcycle and the ladder were

8  completely blocking the sidewalk, and that was it at the time.

9  Q.   Did you see inside that door?

10 A.   I couldn't necessarily see inside of it.  I know it was

11 open, but it wasn't completely open.  It was just kind of up

12 against the RV, itself.  But it looked like either someone was

13 in there or had been in there.

14 Q.   Okay.  Could you see in through any of the windows?

15 A.   I don't believe I looked through any of the windows at the

16 time.  One of the other officers may have.

17 Q.   You don't recall being able to see through any of the

18 windows?

19 A.   I don't recall, myself.

20 Q.   So at this point, you're not sure whether anybody is

21 inside the trailer?

22 A.   Correct.

23 Q.   What did you do?

24 A.   I attempted to contact.  I knocked on the door.  No one

25 answered door and I didn't hear anything inside.  I knocked a

1  second time and announced, I believe, Albuquerque Police.

2  Still no answer.  And I believe Officer Montoya may have opened

3  the door at that time and saw a male laying in the bed.  I

4  think he asked him to step outside, or said, "Would you come

5  outside and talk to us real quick."  The male exited the RV --

6  or, before he asked if he could put some pants on.  I guess he

7  grabbed some pants that were directly on the floor in front of

8  him, put the pants on, and he exited the RV without a shirt.

9      I began talking to him.  Eventually I had asked him who he

10  was, and he identified himself as Daniel Dunsworth, which was

11  the registered owner and who I was under the impression at the

12  time had warrants out for his arrest.  I asked him if he knew

13  if he had any warrants, to which he specified that he did.  I

14  then got some basic information I needed to check through the

15  National Crime Information Center to check and see if those

16  warrants were valid.  They were.

17      During this interaction, Officer Chavez I believe asked

18  him if he wanted a shirt, to which Daniel stated, yes.  He

19  asked him if he could enter the RV to grab him some clothing

20  items the first time, to which the male identified, or Daniel

21  at the time, identified, yes, he can --

22  Q.   Let me stop you there.  At any point, did you enter the

23  trailer?

24  A.   Not that I recall, no.

25  Q.   Did you open the door to the trailer?

1   A.    No.

2   Q.    You mentioned that the man identified himself as Daniel

3   Dunsworth.

4   A.    Correct.

5   Q.    And did he show you an identification for Daniel

6   Dunsworth?

7   A.    Yes.

8   Q.    And that's the person that you ran through your police

9   system to determine whether he had any warrants; is that right?

10  A.    Correct.

11  Q.    Did you ask the man whether he had any warrants?

12  A.    I did, to which he stated, yes.  He said possibly, or I

13  might, something along those lines, I believe.

14  Q.    Did you immediately get any information back from your

15  police system, or did you have to wait for that?

16  A.    There's a small time delay with whatever process they run

17  up there.  After I give them the information, and they go off a

18  name, first name, last name, date of birth kind of thing, it's

19  a couple of seconds, sometimes a few minutes.  And then once

20  they confirm it, they ask if we're out with that individual and

21  if we would like to confirm those warrants, which I did,

22  because I was under the impression I was out with that specific

23  individual due to the information provided to me.

24  Q.    Okay.  Did you, in fact, hear back from your police

25  reporting system?

1   A.    Yes.

2   Q.    And what was that?

3   A.    That the individual had warrants.

4   Q.    What did you do then?

5   A.    I then allowed the individual to finish getting dressed,

6   as he was provided a shirt and some boots.  At that point, I

7   knew he was under arrest.  I was kind of waiting for him to get

8   fully dressed.  I advised him that, yes, he does have some

9   warrants and that he would be going to jail.  He was kind of

10  hesitant, asking if they're misdemeanors, I believe, and if we

11  could work with him, or something along those lines.  I just

12  said that we're just going to take care of these today and he

13  should probably be out pretty soon.  He got dressed, put his

14  boots on, and then I placed him under arrest.

15  Q.    All right.  Officer Foster, after you placed the man under

16  arrest, did you take him back to the police substation?

17  A.    I did.

18  Q.    Was Officer Montoya with you?

19  A.    Correct.

20  Q.    What sort of processing did you do once you took the man

21  back to the station?

22  A.    Our paperwork, the report.  We had to -- I guess due to

23  what the other officers had found and what I had found during

24  my search incident to the arrest, we now had a higher set of

25  charges.  It was no longer just the warrant.

1  Q.   What do you mean by a higher set of charges?

2  A.   Possession of drug paraphernalia was found in the

3  individual's pants while I was doing my search incident to the

4  arrest, as well as I believe Officer Chavez, I'm not sure

5  exactly, but there was a firearm found within the RV.

6  Q.   During your processing of the man, did you at any time --

7  did you continue to understand that his name was Daniel

8  Dunsworth?

9  A.   To my understanding, up until that point, yes.

10  Q.   And when you were running a background check on this man,

11  were you running a background check on a man named Daniel

12  Dunsworth?

13  A.   Yes.

14  Q.   So all the information you had as you were arresting and

15  processing this person was that he was Daniel Dunsworth; is

16  that correct?

17  A.   Correct.  Yeah, I mean, the photo that -- we have to do a

18  felony sup out.  It's a lot of information, and it was almost

19  identical to the male I was out with.  It looked very much like

20  him.

21  Q.   You had no knowledge that he might be somebody other than

22  Daniel Dunsworth?

23  A.   Absolutely not.

24       MR. OUTLER:  Your Honor, at this point I'd like to

25  play Officer Foster's lapel video.

1          THE COURT:  Okay.

2      (Whereupon Officer Foster's Lapel Video played)

3  BY MR. OUTLER:

4  Q.   Officer Foster, do you recall during this search incident

5  to an arrest if you found anything on Mr. Dunsworth's person?

6  A.   It's my recollection that it was just a white crystally

7  substance that was later tested with a methamphetamine test kit

8  that came back positive for meth.

9  Q.   All right.  You said earlier that you had eventually run a

10  III background check on the Defendant; is that correct?

11  A.   Correct.

12  Q.   Was that back at the station or at the scene?

13  A.   It'll be back at the substation.

14          MR. OUTLER:  Thank you, Your Honor.  I pass the

15  witness.

16          THE COURT:  What did you call it, a triple what?

17          MR. OUTLER:  Triple I; III.

18  BY MR. OUTLER:

19  Q.   Do you know what that stands for, Officer?

20  A.   I don't recall.  It's not very often that we check those,

21  and they're with ATF.

22  Q.   But that's what you call it, right?

23  A.   Correct, the III.  I learned about it through my training

24  officer that day.

25  Q.   And that's essentially a criminal background check for an

1  particular individual?

2  A.   A more in-depth, correct.

3       MR. OUTLER:  Thank you, Your Honor.  Pass the

4  witness.

5       THE COURT:  Counsel may cross.

6       MS. RIVAS:  Thank you.

7                      CROSS-EXAMINATION

8  BY MS. RIVAS:

9  Q.   Good morning.

10  A.   Good morning.

11  Q.   You didn't run the name Robert Dunsworth that morning?

12  A.   No, I did not.

13  Q.   You don't know if he did or did not have a warrant?

14  A.   Robert Dunsworth?

15  Q.   Right.

16  A.   Correct.

17  Q.   The warrant for Daniel Dunsworth was a traffic ticket?

18  A.   To my best recollection, it was misdemeanor traffic

19  tickets.

20  Q.   And for traffic tickets, persons aren't usually arrested?

21  A.   They are, typically.  I typically saw it and I typically

22  did at that time.  It's kind of at the officer's discretion,

23  depending on -- it's a discretion kind of thing.

24  Q.   You don't know if whoever got those tickets was arrested

25  that day?

1  A.   I was under the impression of who I was arresting had

2  those warrants.

3  Q.   But you don't know who received those tickets that day?

4  A.   Who received them that day?  I was under the impression

5  that it was Daniel Dunsworth.

6  Q.   So you don't know who the person was that got those

7  tickets that day?  Do you have personal knowledge?

8  A.   Do I have personal knowledge?

9  Q.   Yes, of who received those tickets.

10 A.   That day?

11 Q.   Right.

12 A.   Whoever received them was the one that got the warrants,

13 and that's who I was under the impression I was out with that

14 day.

15 Q.   But you don't know who that was?

16 A.   Daniel Dunsworth.

17 Q.   Did you arrest that person?

18 A.   At the time?

19 Q.   Did you issue those tickets back then?

20 A.   Did I issue them?

21 Q.   In Gallup.

22 A.   No.  But whoever, whichever officer it was, made contact

23 with a Daniel Dunsworth and gave him citations for that.

24 Mr. Daniel Dunsworth didn't show up to court, so he was given

25 warrants.

1    Q.    You don't know if it was Daniel or Robert?

2    A.    If it was a Robert, it would most likely -- if he was

3    identified or had a driver's license of a Robert, his name

4    would be on those citations.

5    Q.    But you don't know?

6    A.    I wasn't in the officer's shoes.

7    Q.    Okay, thank you.

8          You didn't know if anyone was in the trailer that morning?

9    A.    I did not.

10   Q.    You said that you knocked on the door, and we saw that on

11   the video.  So, was your intention to knock on the door until

12   someone answered?

13   A.    I would try multiple attempts, yes, in the hopes of

14   someone possibly answering.

15   Q.    You were going to knock until someone came to the door?

16   A.    I was going to attempt to.  After so many attempts, then

17   we would be under the impression that no one was present and we

18   would have to tow the vehicle.

19   Q.    You had never met the person that you saw in the trailer

20   that day?

21   A.    I had not.

22   Q.    When Officer Montoya opened the door, you didn't have a

23   search warrant for that trailer?

24   A.    No.

25   Q.    In viewing the video, do you remember Mr. Dunsworth

1  asking, in his words, why did you all come strong at him?

2  A.    Correct.

3  Q.    And Officer Chavez, during the questions he was asking

4  Mr. Dunsworth regarding where the phone might be, you were

5  handcuffing Mr. Dunsworth at the moment?

6  A.    I believe so.

7  Q.    Mr. Dunsworth was not driving the car or the trailer or

8  any vehicle at the time?

9  A.    It was not in motion.

10  Q.    And you have legally, under the City code, you have the

11  option of just tagging the car?

12  A.    We could.

13  Q.    But you didn't do that here?

14  A.    No.

15  Q.    And Mr. Dunsworth did say that Sharon Dunsworth was on her

16  way back?

17  A.    Correct, later in the video.

18  Q.    And you discussed possibly reaching out to Mr. Dunsworth's

19  sister, who lived a few blocks away off of Texas?

20  A.    Correct, to see if we could get the vehicle moved.

21  Q.    And in this case, you did not tow the vehicle?

22  A.    No.

23  Q.    And you did not conduct an inventory search?

24  A.    I did not.

25         MS. RIVAS:  I have no other questions, Your Honor.

1          THE COURT:  Is there redirect?

2          MR. OUTLER:  Nothing further, Your Honor.

3          THE COURT:  So I'm clear, the warrants that you

4   arrested him on, were those failure to appear warrants, if you

5   know?

6          THE WITNESS:  To my best recollection, yes.  If you

7   receive a citation and you don't show up, then I was under the

8   impression that it was a failure to appear.

9          THE COURT:  Okay.  Now, you were operating under the

10  assumption that the gentleman you were having contact with was

11  named Daniel Dunsworth, correct?

12         THE WITNESS:  Absolutely.

13         THE COURT:  And at some point, did you learn that the

14  gentleman sitting in court is Robert Dunsworth?

15         THE WITNESS:  Not that day.

16         THE COURT:  Not that day?

17         THE WITNESS:  Not that day.

18         THE COURT:  Okay.  Did you have any knowledge about

19  the handgun being taken into possession by the officers, or

20  retrieved?

21         THE WITNESS:  After the fact, once it was found by

22  the other officers.  I was staying with Mr. Dunsworth at the

23  time since I was the arresting officer.  I believe I was doing

24  a search while other officers I believe had entered and saw it

25  in plain view after entering the RV.  I was not the one that

1  had found the firearm.

2          THE COURT:  Do you know who retrieved the firearm?

3          THE WITNESS:  I believe it was Officer Chavez.

4          THE COURT:  Do you know why the firearm was being

5  retrieved?

6          THE WITNESS:  Due to it being -- I believe it was

7  sitting somewhere in the RV.  It was more of just a safety

8  measure at that point.  We had someone else coming to pick up

9  the vehicle, and I'm not sure what -- I'm not too sure.  I

10  don't recall.

11         THE COURT:  Well, you understand today the

12  Defendant's charged with being a felon in possession?

13         THE WITNESS:  Correct.

14         THE COURT:  At the time that you had the interaction

15  with him and you were placing him under arrest, to your

16  knowledge, was the firearm being retrieved as a safety measure

17  or because you learned that the Defendant had a prior felony

18  conviction?

19         THE WITNESS:  When we possibly looked deeper into --

20  I'm not sure if I had checked any previous history, arrest

21  history or anything.  So at that moment, the possession of the

22  firearm, I'm not sure if we had just taken possession of it and

23  then did some further digging and then found out that there

24  were felonies present.

25         THE COURT:  You weren't the one doing the, as you

1    said, further digging?

2              THE WITNESS:  Correct.

3              THE COURT:  Now, does defense counsel have any

4    questions in light of my questions?

5              MS. RIVAS:  Possibly, Your Honor, if I could have one

6    minute.  No, Your Honor.

7              THE COURT:  Counsel for the United States?

8              MR. OUTLER:  No, Your Honor.

9              THE COURT:  All right.  May the witness be excused?

10             MR. OUTLER:  Yes.

11             THE COURT:  Thank you.  You may step down.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Is there any further evidence?

14             MR. OUTLER:  No further evidence from the United

15   States.

16             THE COURT:  What's counsel's preference?  I've got a

17   lunch meeting today.  Do you want to make closing arguments, or

18   do you want to come back after lunch?  In other words, do you

19   want to make closing arguments now or come back after lunch?

20             MR. OUTLER:  The United States is prepared to proceed

21   however it pleases the Court.  I don't anticipate we're going

22   to take very much time in argument.

23             MS. RIVAS:  We agree, Your Honor.

24             THE COURT:  Okay.  You may proceed, then.

25             MR. OUTLER:  Your Honor, the defense has raised the

1  question of Officer Montoya's original pushing the door open,

2  and then later Officer Chavez's entry into the trailer looking

3  for the phone, and eventually finding the phone next to a

4  firearm, both as Constitutional violations.  With respect,

5  neither one was.

6          Officer Montoya's original pushing of the door open,

7  I could not find a case that would squarely address this on

8  point, but the United States submits that that wasn't a search.

9  The officer was not trying to investigate a crime, he was not

10 looking for a particular person related to a crime at that

11 point, his entire mindset was, this vehicle needs to be moved,

12 at this point I don't believe somebody is here who can move it,

13 so I'm going to have to tow it, but I'm going to take this last

14 step, because the door is already open, just to confirm that

15 there is, in fact, nobody here.  So he opens that door just to

16 take that final step to find out if somebody is present before

17 he moves on to the next step, which would be to tow the

18 vehicle.  In fact, he finds somebody there, and he doesn't

19 enter the vehicle.  He just asks that person to come out.  And

20 that's the end of what the defense is characterizing as an

21 illegal search or illegal seizure of that person.

22          If after knocking and announcing the man had come to

23 the door, they would have asked him the same thing, to step

24 out.  They would have taken his information.  Based on the

25 information he provided, they would have determined the same

1  thing, that he had warrants, and they would have placed him

2  under arrest.  And they would have still been in the same

3  position that they were before, which is, we have to move this

4  vehicle, this vehicle has to be moved.  Officers cannot leave

5  the scene until some arrangement has been made to move this

6  vehicle, whether that's by towing or by somebody else who is

7  allowed, and capable of moving it, moving it.  So in that

8  respect, the United States submits there was no illegal entry

9  or search or seizure into the vehicle when Officer Montoya

10  pushed the door open.

11       But even if it was, the man would have been located

12  eventually if he had either come to the door on his own or if

13  the officers had to tow that vehicle.  There's no question that

14  they would have had to enter that vehicle to inventory it, and

15  if there had been a person in there, they would have found that

16  person.

17       The second, according to the defense, problematic

18  entry into the vehicle was Officer Chavez's entry to locate the

19  phone.  As the Court saw clearly from the video, that was a

20  permissive entry.  They initially asked the person, asked the

21  man, if they could contact his wife; he said, yes.  They asked

22  him for the phone number; he didn't remember it.  They asked

23  him where the number was; it was on his phone.  Where was his

24  phone?  It's in the vehicle.  May we go inside and get it?

25  Yes.  That's the only reason, and that's the entire reason for

1  Officer Chavez's entry into the vehicle to look for the phone.

2          The defense further characterizes Officer Chavez's

3  entry into the trailer as beyond the scope of just looking for

4  the phone.  To read the brief, it sounds like Officer Chavez

5  ravaged the trailer looking for anything but the phone.  But as

6  the Court could see from the videos, his search was restrained,

7  it was exactly in the areas that the Defendant, such as he

8  could, described where the phone might be.  At one point,

9  Officer Chavez actually came back out of the vehicle and asked

10  for clarification.  "You said the phone was near the bed, could

11  it be on the nightstand?  Could it be in the backpack?"  He

12  wasn't getting any clear information from the man about where

13  the phone was, except for the vague impression that it's

14  somewhere near the bed.  So Officer Chavez goes back in and

15  then finds the phone, in fact, on the bed underneath a jacket

16  next to a firearm.  That search is not a Constitutional

17  violation.  It was clearly permissive.  And the evidence in

18  question here was located during that permissive search.

19          But even if that were a problematic search, even if

20  that were somehow a violation of the Constitution, if the man

21  had not given clear permission to go inside, the firearm would

22  have been located during an inventory search subject to tow.

23  The fact that the man had been placed under arrest only

24  increased the possibility or the likelihood that this car would

25  have to be towed.  It certainly would still have to be moved,

1  and now the man, the one person who is there and capable of

2  moving it, is under arrest and is going to be taken away.

3  So it's even more likely at this point that there's

4  going to be a towing process.  This is the officers' state of

5  mind at this point.  A towing is likely the outcome of this.

6  Incident to towing would be an inventory search, and the

7  evidence that was found that ultimately implicates the

8  Defendant in a Federal court case would have been found during

9  that search.

10  THE COURT:  Ms. Rivas.

11  MS. RIVAS:  Thank you, Your Honor.

12  Your Honor, the officers approached this trailer

13  without knowing who was in there, or if anyone was in there.

14  The officers impermissibly opened the door and immediately

15  seized Mr. Dunsworth by asking him to step out.  He did have an

16  expectation of --

17  THE COURT:  How is that improper, that initial part?

18  I mean, if someone is in there, then they're not going to have

19  to tow it.  I mean, it strikes me as pretty reasonable for them

20  to knock on the trailer door and see if someone is in there.

21  MS. RIVAS:  Your Honor, I think it's reasonable to

22  knock on the door.  What's unreasonable is for the officers to

23  open the door and immediately ask him to step out.

24  THE COURT:  Wasn't their testimony that the door was

25  partially open?

eth

1       MS. RIVAS:  Your Honor, the Court can see from our

2   Exhibits B, C and D that the door was not partially open, and

3   it was impossible for anyone with normal human vision to be

4   able to see through that door and see that there was anyone in

5   there.

6       Your Honor, the officers immediately seized --

7       THE COURT:  Let me ask you this:  Exhibit B is

8   admitted.  What's your representation as to when the photo was

9   taken?

10      MS. RIVAS:  Your Honor, that is a screenshot, and I

11  believe that I left the time at the bottom right of the screen

12  capture.

13      THE COURT:  It was a screenshot off the video?

14      MS. RIVAS:  Yes, it was, Your Honor.  Those were

15  screenshots as the officers approached the trailer.

16      Your Honor, Mr. Dunsworth was vulnerable and had an

17  expectation of privacy.  He was asleep in his underwear.

18  That's fairly private.  Immediately the officer asked him to

19  step out, and Mr. Dunsworth doesn't step out without first

20  asking permission.  The officers take control of him right

21  away.

22      He's outside of his trailer with no shoes, no shirt.

23  Officer Montoya starts asking him questions about the bruises

24  on his stomach.  If the Court will see from the video,

25  Mr. Dunsworth doesn't say, "Hey, can one of your officers go in

1   there and grab me a shirt?"  No, he says, "Can I have a shirt?"

2   And the response is, "My officer can go in there."  "Can I have

3   some shoes?"

4        The officers asked Mr. Dunsworth for his information.

5   Had he provided his correct information, I do not believe that

6   any warrants would have come back for him.  There would have

7   been no reason to apprehend him.

8        THE COURT:  Right, but that's not the officers'

9   fault, is it?

10        MS. RIVAS:  No, Your Honor.  But that also, I think,

11   creates an issue of whether, as the Government argues, his

12   arrest would have been inevitable and that the trailer would

13   have been towed.  They opened the door to the trailer without

14   probable cause, without any exigent circumstances.

15        And regarding the consent, Your Honor, we ask the

16   Court to see that any consent that he gave was not voluntary.

17   There are three officers surrounding him.  One is at the

18   entrance of the trailer, and the other two are positioned so

19   that he cannot, in essence, walk away.  He's out there with no

20   shirt, no shoes.  By Mr. Dunsworth's own words, the Court can

21   hear him say, "Why did you come to me all strong?"  He feels

22   the power of three police officers asking him all these

23   questions.

24        The questions regarding where the phone might be are

25   one after the other.  And not only that, but during those

1   questions, Mr. Dunsworth is being arrested and is being placed

2   in handcuffs.  As the Court can see from the video, it's windy,

3   and the officer keeps asking questions.  Is it in the

4   nightstand?  Is it next to it?  Is it on the floor?  Is it in a

5   backpack?  All those things that Officer Chavez asked, the

6   phone was not found in any of those places.

7           We'd ask the Court to find that a search of that

8   trailer was not inevitable, because it was not towed and it was

9   not inventoried.  It's not a hypothetical, this might not be

10  towed and this might not be inventoried, because, in fact --

11          THE COURT:  If you look at your Exhibit B, you see a

12  motorcycle that's totally blocking the sidewalk.  So there's no

13  way a pedestrian can walk, because you've got a chain link

14  fence on the right side of the photo, you've got the trailer,

15  and you've got a motorcycle there.  So when the officers are

16  entering -- I mean, I can't quote it offhand, but I'm positive

17  there's probably some kind of City ordinance that prevents the

18  motorcycle from blocking the sidewalk.

19          And then, the officers were dispatched because I

20  think the testimony was the trailer had been there several

21  days.  You can't just park a trailer wherever you want on the

22  side of a street and leave it there.  For all the officers

23  knew, the trailer could have been abandoned.  If it's abandoned

24  property, they've got to -- I guess I'm having trouble

25  understanding your argument that there's a right of privacy

1   there in terms of you can just park a trailer illegally and

2   just leave it there.

3           MS. RIVAS:  Your Honor, what we're saying about the

4   vehicle being parked illegally is, we asked Officer Montoya and

5   he confirmed that towing the vehicle was discretionary.  So I

6   think that goes toward what the Government is arguing, that a

7   tow and an inventory would have been inevitable, because they

8   did have the option, they did have the discretion of

9   red-tagging it, as I think Officer Montoya indicated, and

10  trying to somehow reach the owner of the vehicle.  But it was

11  not something that had to be done or required, it was

12  discretionary.

13          Your Honor, we also ask that the Court observe,

14  regarding the consent, that the Government has the burden of

15  proving that it was an express consent, and we'd ask the Court

16  to find that Mr. Dunsworth's words of, "It's in there," is not

17  an express consent.  The officers didn't ask open-ended

18  questions like, "Hey, is it okay if we go into your trailer to

19  maybe retrieve your phone?"  I believe that Officer Montoya

20  said, "Hey, my partner can go in and get the phone."  With

21  three officers around him, him sitting on the bench -- I mean,

22  on the curb, about to be arrested, that is not express and is

23  not voluntary.

24          And Your Honor, regarding the issue of the door, I

25  realize that the case we cited, Arellano-Ochoa, had to do with

1  the trailer, but it did confirm a similar situation, which is

2  that there is some expectation of privacy even when it's just a

3  screen door that's closed.  And in this case, not only was the

4  screen door closed, the solid wood door was also closed.  And

5  as we submit from our exhibits, it was impossible for the

6  officers to have seen that anyone was in there.

7          So for those reasons, Your Honor, we ask that the

8  Court find that the initial approach immediately seized

9  Mr. Dunsworth, that any questions were answered under duress,

10 and that anything that flowed from the initial entrance to the

11 trailer violated Mr. Dunsworth's Constitutional rights.

12         THE COURT:  Since the United States has the burden of

13 proof, I'll give you the last word here.

14         MR. OUTLER:  Your Honor, just briefly, the defense a

15 number of times kind of characterized the police response to

16 this call for service as heavy-handed, that they were coercive

17 with him, they were pressuring him and peppering him with

18 questions.  I think as the Court can see from the videos, it

19 was anything but heavy-handed.  If anything, they were overly

20 solicitous and patient with Mr. Dunsworth, trying to find a

21 solution to this problem.

22         It makes a difference that the officers' state of

23 mind throughout this process was that this was an illegally

24 parked vehicle that had to be moved.  In the process of

25 figuring out how that was going to be done, they found a person

1  who had outstanding warrants, so they had to arrest that

2  person.  But they weren't investigating any further crime at

3  that point.  They didn't know there was any further crime at

4  that point.  So their state of mind remained, okay, we now have

5  a person under arrest, we already had a reason that the vehicle

6  needed to be moved, now we have another reason the vehicle

7  needs to be moved, and that's where they were in this.

8        We have cited in our brief and attached for the

9  Court's knowledge as Exhibit 8 the City ordinances that this

10 parked RV was violating.  These are the reasons why the

11 officers simply couldn't leave that scene without making

12 arrangements for that vehicle to be moved.  So if nobody had

13 been found, if nobody had come to the door, if they hadn't

14 found somebody inside, they most definitely would have towed

15 that vehicle, and if they had, they would have inventoried it

16 and found the firearm.

17       THE COURT:  Okay.  I'll take the matter under

18 advisement and I'll issue a written decision.  Probably I'll

19 get it out by the end of this week or early part of next week.

20       Anything further from the United States?

21       MR. OUTLER:  Nothing further, Your Honor.

22       THE COURT:  Anything further from the defense?

23       MS. RIVAS:  No, Your Honor.

24       THE COURT:  All right, thank you.  We're in recess.

25 (Proceedings adjourned at 11:55 A.M.)

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW MEXICO

3    _____
                               )
4    UNITED STATES OF AMERICA,  )
                               )
5         Plaintiff,            )
                               )
6       vs.                     )   No. 1:18-CR-03475-WJ
                               )
7    ROBERT DUNSWORTH,          )   Hearing re: Defendant's Motion
                               )   for Suppression of Evidence
8         Defendant.            )   (Doc. 39)
     _____)

9

10    CERTIFICATE OF OFFICIAL COURT REPORTER

11        I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12   Realtime official Court Reporter, in and for the United States

13   District Court for the District of New Mexico, do hereby

14   certify that pursuant to Section 753, Title 28, United States

15   Code, that the foregoing is a true and correct transcript of

16   the stenographically reported proceedings held in the

17   above-entitled matter on Tuesday, March 10, 2020, and that the

18   transcript page format is in conformance with the regulations

19   of the Judicial Conference of the United States.

20   Dated this 8th day of April, 2020.

21

22   _____
     MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23   UNITED STATES COURT REPORTER
     333 Lomas Boulevard, Northwest
24   Albuquerque, New Mexico  87102
     Phone:  (505)348-2334
25   Email:  Mary_Loughran@nmd.uscourts.gov